and Kathy L. Lanier and her official capacity as Chief of Police for the Metropolitan Police Department Appellants. Ms. Alakhan for the Appellants, Mr. Thompson for the Appellees. Ms. Tullis, Mr. Gurra. Good morning. Good morning and may it please the Court. Lauren Ali Khan for the District of Columbia. I would like to reserve three minutes for rebuttal. I'd actually like to start where Mr. Gurra ended, which is to say the District acknowledges that bear means carry. That's what Heller says. But Heller in the very next sentence went on to say that the right was not to keep and carry any weapon for any purpose. And gave us its first example. First, before we got to felons, those who were mentally ill. But it's its first example that the majority of 19th century courts upheld bans on concealed carry. So we know that the scope right there. Mr. Gurra's point, I think, was, at least in the briefing, was that in each of those instances, open carry was allowed. That you never had a complete ban on carry. You just, you get a choice, open or concealed. In 19th century, mores preferred open carry to concealed carry. Two responses. As you discussed with my colleague, Ms. Johnson, we think there is a rich history, both in the statute of Northampton in England and how it carried over, that had complete prohibitions on carrying in densely populated urban areas. Both on concealed and on open carry. We think that comes from Hawkins. We think that comes from Blackstone. But even if it is the case that it has to be one or the other. Ms. Johnson, she never answered James Wilson. James Wilson is a pretty important figure for many of us. Most, I think, without question, was highly regarded of the framers in terms of his knowledge of the law. And he said it was, you know, dangerous and unusual. As opposed to common. No, no, you're talking about the 1804 James Wilson treatise. He says that a phrase or crime is against the personal safety of the citizens. And goes on to say that it's, you know, because it's to the terror of the citizens. These are considered common nuisances. And he goes on to say, in some cases, there may be an affray where there is no actual violence. As where a man arms himself with dangerous and unusual weapons in such a manner as will naturally terrify the people. And we think that that coincides with what Blackstone was talking about and what Hawkins was talking about. Which is that the carrying of weapons in the public concourse in and of itself is what terrifies the people. I mean, I don't take it from the language. He says there may be an affray where there is no actual violence. As where a man arms himself with dangerous and unusual weapons in such a manner as will naturally terrify the people. Right. And that is arms that are carried not in the public concourse. Arms that are within the home. Arms that are within the countryside. That's your interpretation. And you added an important edit of what he said. So give me, if you're relying on this so much, what were the population levels in the 1780s that justified Northampton-like statutes? And when did they not have? When were they too sparsely populated? At the time of the framing, the majority of Americans lived outside of cities. And so when we look at how Northampton laws were defined, both in London, or in the UK and in America, it was cities and towns. You see that first in 1594 from the Queen Elizabeth Proclamation. And you see it also in Heller 1 itself. And footnote 10, Justice Scalia cites a 1704 ban on carrying in London and the suburbs. London and the suburbs. That's a definition. You see that carrying over into America in some of our good cause variants that we put into the statutory appendix. It was the corporate limits of Nebraska City, Nebraska. The corporate limits of Los Angeles City, Dallas, Texas. And neither set of plaintiffs here has argued that the district is not an exclusively urban jurisdiction. If they would like to raise that below, or if someone would like to challenge that in another case, that may be very well appropriate. But here we are taking as conceded that the district is exclusively urban. And if London and the suburbs in 1704 was exclusively urban such that there could be a complete ban on carrying there, we think that is also the case here. And our law is less restrictive than the Northampton bans. As Ms. Johnson noted, in the 1800s, these complete bans... So your argument is that you could actually, you could have done more. You could have banned all carrying because it's urban, right? I think that... That's your argument with Northampton. Go all the way with it. Take it all the way or not at all, right? You're arguing that if we're looking at the meaning of the Second Amendment informed by Northampton, statutes of Northampton, that a complete ban is possible in urban areas. So it's not a complete ban. It's a complete restriction on carrying on this crowded city street. It does not mean that one cannot have a weapon in their home, in their place of business, to transport it for lawful purposes. Carry means outside the home. Carry means outside the home. Well, I do need to push back a little bit because historically people had much larger properties and so it was carrying on their grounds. You look at Thomas Jefferson carrying about his farm or his Madison or others. I thought we were talking about cities. I thought we were talking about cities now. Even in cities, people tended to have larger land. But your argument is the District of Columbia could ban all carry. My argument... Completely ban it. ...is that if the council went that route, we'd be here on a very different record. We'd be more akin to what we see more... Does the council have the authority to do that? We're trying to understand the scope of the right here. I think based on the statute of Northampton, the early American laws, yes, there is an argument to be made for a complete ban on public carrying because of the risks to public safety. However... Your argument raises an interesting question about the empirical issues that are in dispute. There are various scenarios that are offered by you for the proposition that allowing law-abiding people to carry arms outside the home will lead to violence in a variety of scenarios. Is there any reason to think that that's more common for guns carried outside the home than for guns carried inside the home? So, Judge Williams, the... I mean, for example, one I remember distinctly is the idea that people contemplating some sort of dead act, if they think the target is going to be armed, are more likely themselves to bring arms. Now that, I would think, would be just as true in the home as on the sidewalk. Sure, but other things like averting confusion by a third person in a situation where the police are interacting with a citizen and there's a third person who's armed, we tend to see that outside of the home. The same thing with... What about the particular thing that you raised, which I then raised with you, which is different from the three-party encounter? That people tend to have their guns stolen because they're targeted? No, no, it isn't a matter of stolen. The argument in your brief, one of the briefs here, is that if a thug knows that a potential target is armed, he or she is much more likely to arm himself, and that increases the risk of violence. Why is that true for the home as well as the sidewalk? So, it is very well true in the home, but the public safety concerns are different. In the home, the people that are susceptible to the public safety concerns of being shot, conflicts escalating into something with lethal weapons, those are borne by the people in the home, the family, and those that are invited in. But on the crowded city streets of the district, the bystanders are everywhere. People do not say, do you have a weapon in your home? Okay, I'm going to choose not to go there because of the public safety risks. It's because they are in the public concourse. That public safety has always required more circumscribed gun regulations than in the home. And I think that comes from a longstanding distinction with the Castle Doctrine. When we're talking about the treatises, Blackstone and others talk about how, you know, while you may not carry outside the home, I mean, Hawkins gives an example of someone who carried concealed for purposes of self-defense, who was found to be violating the statute of Northampton. Well, that is the case. They all have longstanding exceptions for the ability to defend yourselves with arms within your home or on your property. And the district here preserves that. We have laws that allow you to have a weapon in your home, to have it in your place of business, to lawfully transport it. The question is whether you can carry it openly on the crowded city streets of the district. But it's not openly. As I understand it, the district is emphatic that neither open or concealed carry is permitted. And the plaintiffs are equally emphatic that all people must be able to carry. They don't care whether it's open or closed. Sure. Our law is concealed carry. But I think as the Peruta Court on Bonk held, there is no right within the Second Amendment to concealed carry. And that's all that the plaintiffs here are seeking. Both of them are seeking a license to concealed carry. And I believe the majority opinion in Peruta addressed if there is a right to carry, they think it's only openly. And so there needs to be a lawsuit to challenge a prescription on open carry. Here all we have is a demand for them to be able to concealed carry. And we think there's a rich tradition of banning both open and concealed carry in urban areas precisely because of the public safety risks. But even if we're just looking at a ban on concealed carry, they do not allege that they have the ability or they should have the ability to open carry in the district. They merely ask for a concealed carry license. And that's something that Peruta says is foreclosed. But I'd also like to turn to the good cause laws on which the district's law was modeled, that of New York, of New Jersey, and Maryland, all of which were upheld by the Second, Third, and Fourth Circuits. Those were all on summary judgment records. As Ms. Johnson mentioned, we're here on a preliminary injunction. This case is in its infancy. The gray plaintiffs filed their complaint, I think it was two days before Christmas last year. The parties are in the process now of marshaling the empirical evidence that we think would satisfy any level of scrutiny that could apply. So I think all this court needs to do now is to, for the preliminary injunction analysis, you can go to step twos, assume that intermediate scrutiny applies, and determine whether or not plaintiffs are so likely to prevail on their claim that they have a right to carry indiscriminately on the crowded city streets of the district that they should be entitled to that relief now, before discovery closes, before summary judgment has been briefed. And I think Heller is a good analog. That case was remanded by this court for further proceedings. And so here, that's what we need as well. So we would ask that you affirm Judge Clark Attali's decision denying the preliminary injunction as to the red plaintiffs and reverse Judge Leon's, because he made significant legal errors, and also because he erred in assessing the equities. I see I'm out of time, but I do hope you'll permit me a few minutes on rebuttal. All right. Thank you. All right. Thank you. Mr. Thompson. Good morning, Your Honors. It may have pleased the Court, David Thompson of Cooper and Kirk, for Matthew Grayson, the Pink Pistols. The key to this case is the Supreme Court's decision in Heller. There, the Supreme Court said that the text of the Second Amendment, quote, guarantees the individual right to possess and carry weapons in case of confrontation. It said that the, quote, central component of the right was self-defense and that the core lawful purpose was self-defense. What do you do with the language of Justice Scalia that the right is more acute at home? That suggests it's less acute outside the home. And we see that in Heller in a couple of different ways. Number one, in that there's an acknowledgment that in sensitive places, the State, that that's a longstanding prohibition and the State can regulate that. And then the manner of carriage, whether the State chooses concealed or open. So, yes, we acknowledge that it is most acute in the home, but it is still acute outside of the home, and certainly we see that from the text and the history. We also, it's very interesting that in describing and justifying the categorical approach that Heller took, it said that there were, quote, few laws in the history of our nation have been close to the severe restriction of the district's handgun, and some of those few have been struck down. And it went and it pointed to a carriage law, a carriage ban. That was the law that Heller pointed to as justifying the categorical approach. So I want to push back on the notion. How do you respond to your friend's arguments that the Northampton statutes were the norm in the United States? In 1820, Your Honor, there were 23 states and four of them, only four of them, had a Northampton-like analog. And of those four, Judge Williams, you asked if there were any cases. Two of those fours were interpreted by the State Supreme Court. Tennessee in Simpson v. Tennessee and Huntley v. State in North Carolina. And in both instances, the Supreme Courts of Tennessee and North Carolina said that simply carrying a firearm did not violate those statutes. They agreed with what Heller would subsequently say, that dangerous and unusual meant exactly that. It just didn't mean a firearm and that it had to be to terrify the people. And there had to be an evil intent, which we see in Sir John Knight's case from 1686. So the notion that in America, early 19th century America, there were these Northampton analogs everywhere, first is false, and second of all, where they did apply, they had been interpreted to mean that carriage was all right unless it was accompanied by conduct that would be terrifying to the people. What did dangerous and unusual mean? Well, in Heller, they said that weapons that were commonly possessed by law-abiding citizens were not dangerous and unusual. And it was on that basis that handguns, for example, were entitled to be protected under the Second Amendment. It did not just mean, oh, a firearm is dangerous. What about your friend's argument that we're on preliminary injunction here and we just ought to let this go along? We don't have enough of a record here to know. This wolf comes as a wolf. The chairman of the D.C. council said that everyone on this council wants to restrict the right to carry. The whole centerpiece of their argument is we need to restrict the right to carry. Usually we don't write the law down on the basis of the motivations of the people who pass it down. Well, Your Honor, in the equal protection context, we certainly do in Washington. In Washington v. Davis, in the Lenin context. But finally, we can look at the effect here. The effect is an absolute ban, and it's important to know. I think there was a suggestion that Heller, too, the train had left the station on whether we apply intermediate scrutiny. No, I meant the train had left the station vis-à-vis Judge Kavanaugh's dissent. And I want to push back on that, Your Honor, because the majority in Heller, too, said tiers of scrutiny apply only, quote, where the restriction is, quote, significantly less restrictive than an outright ban. This law is not significantly less restrictive than an outright ban. So the notion that Heller, too, supports us, that this is a categorical, this is not significantly less restrictive than an outright ban. And therefore, inconsistent with what the Supreme Court said. You don't think you win under strict scrutiny? No, we win, Your Honor, under either standard. But we did want to point out that Heller, too, does not require intermediate scrutiny to apply here. There was also a question about, Judge Williams, you asked, as well as their empirical difference between public safety threat to homeownership and carriage. I wanted to point out that a lot of the empirical evidence, the majority of the empirical evidence, that was cited, too, by the District of Columbia was cited to the United States Supreme Court. And the Supreme Court, you know, disregarded it, said it did not matter. And it did so because there's no deference to be given to legislative findings and to social science research where you have a constitutional right at stake. So take, for example, if the district were to come in with a ream of legislative findings and social science research showing the exclusionary rule was really bad for public safety or that Miranda had negative consequences for public safety, this court would disregard it. And we would submit the court should do the same here. With respect to the point, Your Honor, that Judge Griffith, you asked whether this was akin to a time, place, and manner restriction. And it's really not in the sense of, for Mr. Grace, my client, there is no time and there is no manner and there is no place in which he can carry his firearm. So for the typical law-abiding citizen who has not been subjected to a specific threat, this is, in fact, a ban. They have made the point that they've tried to say that the history suggests that firearms should only be allowed and carried in the countryside. But if we looked at the text of the amendment, we know from Heller that cheap applied in urban areas. They made this argument in Heller that the district's special, it's unique, it's an urban area, and it was rejected. So there's no way in which cheap can apply to urban areas and bare would not. We also know from the precedent that there isn't a single case. There is not one case they can point to that has adopted this distinction between a right to carry in the countryside but not a right to carry in the cities. And if we look at the practice, we can see John Adams talking about the Boston Massacre and perhaps the most urban setting of the time, State Street, Boston, saying that the colonists had a right to carry their firearms there. As far as you're talking about the other circuits, doesn't your point show that they were willing to accept anything? The other circuits went wrong. Those cases should be distinguished on three grounds. Number one, they were not faithful to the teaching of Heller with all respect to those circuits. That's a distinction. That's just to say they're wrong. They're wrong. So thank you, Your Honor. Good point. Good point. Two distinctions then, not three. The legal distinction is Heller 3. In Heller 3, this court said that a law that is animated and justified by a purpose to suppress the right, to limit the right, is impermissible. There it was a one-gun-per-month purchase limitation, and Heller 3 said, if we accept this rationale, that would justify a ban if they're just trying to limit the number of guns. Here they are trying to limit the amount of carriage. So this circuit has precedent that is faithful to Heller, the Supreme Court Heller, and that is different from the precedent in those other circuits. We also have a factual distinction. We have Chief of Police Lanier, the law enforcement, top law enforcement official in the district saying, quote, law-abiding citizens that register firearms are not our worry. And how could they be? As Judge Leon said, there is a veritable gauntlet of restrictions and rules that someone has to go through to get one of these permits. Chief Lanier has laid a factual predicate saying, we're not concerned about public carriage by law-abiding citizens, and we can look at state after state, and over 99% of people who get these concealed carry permits are law-abiding, never have a revocation, and there simply isn't an issue. So for all of those reasons, we ask the court to affirm. All right. Thank you. Ms. Allicott, why don't you take three minutes. Could I ask you to respond to the reference to, I think it was Mr. Wells' comment in the city council about, I can't get the quote exactly right, but there was no one on the city council who, we all want to restrict handguns, or something like that. What are we to make of that? I think two responses. The council was trying to limit the public safety risks that are inherent in carrying a firearm outside the home. Plaintiffs, no one in the council was able to point to any other alternative but these good reason laws, which had been upheld in the second, third, and fourth circuits. That raises a question. Were there less restrictive proposals that were rejected for some reason? The only lesser restrictive one that we see is what the plaintiffs just alluded to, and what Judge Leon said, which was just suitability standards and determinations for getting a license. Was that discussed at the city council? Yes, the council looked at that evidence and found that in shell issue regimes, regimes that all have these kinds of suitability, are you mentally ill, do you have a conviction, are you eligible to carry under federal law, those still have higher rates of aggravated assault, rape, robbery, and so they felt that suitability standards alone were not sufficient. So they looked to... You recognize the data on that is very complex and conflicting. The data is complex and conflicting, but that's why this court defers to the judgments of the legislature. That comes clearly from Turner 1 and Turner 2. I believe that, well, first of all, I would argue that intermediate scrutiny is what applies. Nothing more than intermediate scrutiny, certainly, given that we're in the preliminary injunction stage, and certainly because every court had considered this question on the good reason laws, second circuit, third circuit, fourth circuit, found not only that intermediate scrutiny applied, but that these laws withstood intermediate scrutiny. But as to the record, I mean, again, we're on a preliminary injunction. We believe that the counsel record, which was relying on the most relevant and contemporary and sophisticated statistical modeling, showed that right to carry jurisdictions, jurisdictions without a good reason requirement, had higher rates. So if we applied strict scrutiny, you think that's the winning argument for you? So no one disputes that the interest in public safety is compelling. So the only difference between strict and intermediate scrutiny here would be the level of fit, and we think that the fit does survive. We think it survives for the same reasons that were articulated in the second, third, and fourth circuits, that this was the – there's no other least restrictive alternative that anyone has pointed to to suggest that we could reduce the ill effects. How about I live in a dangerous neighborhood? How about being allowed to show that I live in a dangerous neighborhood? I live in a dangerous workplace. That's not least restrictive. If you have a dangerous workplace, you're allowed to carry it in your home. You're allowed to carry it at work. But I also – this, I think, comes back to your hypothetical – I live in a dangerous neighborhood. We actually work in a very safe building. We have wonderful marshals who are protecting us. But there are a lot of people in our country who don't have the benefit of what we judges have. They live in very dangerous neighborhoods. And you're saying that the D.C. Council did not consider that as an alternative to what they came up with, that someone could say, oh, my gosh, I live in a really dangerous neighborhood. Here are all those statistics that show that. You know, we do that for college students. College students get the benefit of knowing if they're in a dangerous neighborhood. Do citizens get the benefit of that? I live in a dangerous neighborhood. That's not a sufficient showing that I ought to be able to defend myself against the first attack? I have three responses to that, Your Honor. First, the living in a dangerous neighborhood alone is not sufficient. That was an issue in the New York, Maryland, and New Jersey laws, all of which were upheld. But secondly, these plaintiffs have not come forward to show I live in a dangerous neighborhood. When I leave, I'm worried about my public safety. They had the ability in their preliminary injunction briefing to say why they thought they needed a weapon. They chose not to. So they've not carried their burden for purposes of a preliminary injunction. And third, the question of whether as your hypothetical. That's interesting. So the process asks that of them? Yes. The process identifies the nature of their neighborhood as a relevant. I thought the statute excluded the mere fact of a dangerous neighborhood. One shall demonstrate risk of fear or injury by showing special need for self-protection distinguishable from the general community as supported by evidence of specific threats, previous attacks. And let's look. If you look at J.A. Poirier's. I don't think you're reading it. Yeah. So they do then go on to say, yes, that living in a high-crime area itself. But take Judge Griffith's hypothetical. If you're a woman who lives alone, who lives in a high-crime area, and you put those forward to. I thought his. Oh, OK. No. Right. Living in a high-crime area alone, yes, is not sufficient. But if you have reason to believe that you may be subject to an attack or that you have been threatened. And I would commend this court to look at J.A. 442 to 444. And what would that sort of reason be? So she's now making application. She says, I live in a dangerous neighborhood and I'm afraid. I'm afraid my neighbor has been robbed. I worry that as a smaller woman, I'm not able to defend myself. I come home late at night because I have the type of job. She gets the. I don't know. We haven't seen someone bring that case. What we have seen. How close does the neighbor have to be in that hypothetical? These are questions that are. I mean, if the neighbor can be three blocks away, then it's not so restrictive. So there are a couple of responses to that, Judge Williams. First, that is a question for first the chief of police, then with a right of review to the concealed carry licensing pistol board. And there's ultimately. Looks. It seems to drive a hole in the statute's preclusion of a permit for people just on the basis of dangerous neighborhood. Well, I'm neither the chief of police nor the concealed pistol licensing board nor the DC Court of Appeals. So I don't know how we draw those lines. I can look to New Jersey and New York, which have a 90 and 100 year respective tradition of applying these good reason laws and have significant case law, a common law tradition that does give us what we think the boundaries of good reason are. But to be sure, plaintiffs here have not come forward with any evidence. They haven't alleged. I live in a dangerous neighborhood. I live alone. I come home late at night. I have valuable objects in my home. They had their opportunity to do so, and they didn't. If at the end of the day they can prove this law unconstitutional, and we don't believe they can, they'll be entitled to an injunction then. But now, at the infancy of this litigation, on a preliminary injunction, they simply have not carried their burden. So we would ask that you affirm Judge Clarkatelli and reverse Judge Leon. Thank you.  Thank you.
judges: Henderson, Griffith, Williams